IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PROMOS TECHNOLOGIES, INC.,        )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        C.A. No. 06-788 (JJF)
                                   )
FREESCALE SEMICONDUCTOR, INC.,     )
                                   )
            Defendant.             )
_____   )

**FREESCALE'S OPPOSITION TO PROMOS TECHNOLOGIES' MOTION
TO COMPEL FREESCALE TO PRODUCE TECHNICAL DOCUMENTS AND
DAMAGES-RELATED DOCUMENTS RELATING TO ACCUSED PRODUCTS
AND TO APPEAR FOR DOCUMENT-RELATED DEPOSITION**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
302.658.9200

*Attorneys for Freescale Semiconductor, Inc.*

OF COUNSEL:

David L. Witcoff
Kevin P. Ferguson
John M. Michalik
JONES DAY
77 West Wacker
Chicago, IL  60601-1692
312.782.3939

F. Drexel Feeling
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH  44114-1190
216.586.3939

Dated:  September 10, 2007

i

## TABLE OF CONTENTS

PAGE

I.  PROMOS'S REFUSAL TO DEFINE AND CONFINE ITS DISCOVERY TO CHAN PATENTS THWARTED THE DISCOVERY PROCESS. .........................................................................4

    A.  The Chan Patents, Which ProMOS Is Asserting Broadly, Are Very Narrow. ...........................................................5

    B.  ProMOS Refused To Narrow The Scope Of Its Discovery Requests Until July 6, 2007. ..........................................6

    C.  ProMOS's Attempt to Explain Away Its Overly Broad and Unduly Burdensome Discovery Requests Is Not Grounded In Fact. ...........................................................................7

II.  THE DOCUMENTS THAT PROMOS CLAIMS ARE "CRITICALLY ABSENT" FROM FREESCALE'S PRODUCTION HAVE ALREADY BEEN PRODUCED OR DO NOT EXIST. ...............................................................................9

    A.  Freescale Had Produced Its RTL Code Prior To ProMOS Filing Its Motion. ..............................................................9

    B.  Freescale Is Not Obligated To Create Documents That Do Not Already Exist, And If ProMOS Wants To Create Schematics It May Do So Under The Terms Of The Protective Order. ...........................................................9

    C.  Contrary To ProMOS's Assertion, Freescale's Production Includes Documents That Exist That Show The Specific Design And Layout Of Its Products .............................................11

    D.  Freescale Is Producing Damages-Related Documents. .................12

III.  FREESCALE'S PRODUCTION OF ITS RTL CODE WAS PROPERLY DONE PURSUANT TO THE TERMS OF THE PARTIES' PROTECTIVE ORDER ...........................................................12

    A.  ProMOS Knew And Agreed That RTL Code Is Computer Code Protected By Paragraph 4 Of The Protective Order. ............13

    B.  As The Parties Previously Acknowledged, RTL Code Is "Computer Code" Covered By Paragraph 4 Of The Protective Order. ...........................................................13

i

C.      ProMOS's Own Letters Use the Term "RTL Code." .....................15

IV.    PROMOS'S 30(B)(6) TOPICS SUFFER THE SAME FLAW AS
       ITS DISCOVERY REQUESTS, AND DEPOSITIONS SHOULD
       BE CONDUCTED IN THE MOST REASONABLE LOCATION
       IN THE U.S. ..........................................................................................15

V.     ANY DELAY IN OBTAINING DISCOVERY WAS SELF-
       INFLICTED AND PROMOS'S REQUEST FOR SANCTIONS
       SHOULD BE DENIED. ..........................................................................17

# TABLE OF AUTHORITIES

PAGE

CASES

*Cornell Research Found., Inc. v. Hewlett Packard Co.*,
    223 F.R.D. 55 (N.D.N.Y. 2003) ..........................................................................................11

OTHER AUTHORITIES

7 Moore's Federal Practice ¶ 34.14 (2007) .......................................................................9

RULES

Rule 16 ..................................................................................................................................1

Rule 30(b)(6)........................................................................................................................15

i

## NATURE AND STAGE OF THE PROCEEDINGS

ProMOS filed its complaint in this action on December 22, 2006, a few weeks after Freescale filed a patent infringement action against ProMOS in Texas.  As set forth in the scheduling order entered following the Rule 16 scheduling conference in this case on April 20, 2007, fact discovery is to be completed by January 21, 2008, with a document production completion date of August 15, 2007.

After several months during which ProMOS refused to identify allegedly infringing products, whether by specific product name or by identifying characteristics, ProMOS finally on July 6, 2007 identified a complete list of allegedly infringing products.  Prior to that time, ProMOS had identified only a few allegedly infringing products, although it pressed for discovery on virtually the entire Freescale product line.  It was ProMOS's insistence on pursuing that vastly overbroad discovery that was the subject of the (misguided) motion to compel ProMOS filed on July 6, ironically a few short hours after it finally identified allegedly infringing products.  Freescale had never refused to produce documents in response to discovery actually directed to allegations of infringement, and ProMOS's motion was shown to be unfounded by its own actions in finally identifying infringing products -- Freescale, as it had said it would do all along, has proceeded since then to produce documents relating to the specifically-identified products.

ProMOS's current motion is equally unfounded.  Freescale has produced its technical documents for the circuits possibly relevant to the Chan patents; Freescale has produced its RTL code pursuant to the negotiated provision of the Stipulated Protective Order that governs highly confidential computer code, such as RTL code; Freescale is currently producing the damages-related discovery that ProMOS requested; and Freescale has stood, and stands, ready to make a 30(b)(6) witness available to answer ProMOS's document-related

questions. To the extent ProMOS is complaining about the fact that document production was not completed by August 15, 2007, that is a problem of its own making, given its months-long refusal until July 6 to provide a reasonable scope to discovery.

PROMOS'S MOTION

ProMOS's motion asserts a litany of wholesale, alleged refusals by Freescale to provide discovery, specifically that Freescale allegedly: (i) refuses to produce technical documents that show the design and layout of its products; (ii) refuses to produce certain specific documents called circuit diagrams and schematics of its products; (iii) will produce RTL code but only under what ProMOS calls draconian restrictions; (iv) refuses to produce damages-related documents; and (v) has twice refused to appear for a 30(b)(6) deposition. None of ProMOS's assertions are correct. Freescale has fully complied with its discovery obligations.

As to (i), at the time ProMOS filed its motion, Freescale had produced the technical documents that ProMOS complains are missing.

Contrary to ProMOS's assertion, as to (ii), Freescale has not "refused to produce" circuit diagrams and schematics. Freescale has produced the responsive circuit diagrams and schematics that it found. As for any other circuit diagrams and schematics, as ProMOS admits in other parts of its papers, these documents do not actually exist and would have to be generated by Freescale. Moreover, they would have to be generated using parameters that ProMOS has not identified. ProMOS cites to no authority that Freescale can be compelled to produce such (undefined) documents that do not exist.

The "draconian restrictions" that ProMOS cites in (iii) concerning Freescale's production of its RTL code are nothing more than the express terms that the parties *agreed to* and were entered by the Court in the parties' Stipulated Protective Order regarding the production of computer code. ProMOS's declaration, made to avoid ProMOS's own stipulation,

- 2 -

that recasts Freescale's "RTL code" as "documentation" and not "Code" is not correct. As counsel for Freescale told ProMOS's counsel during negotiations of the Protective Order terms and before ProMOS subsequently *agreed* to those terms, RTL code *is* the precise type of computer code that is contemplated by Paragraph 4 of the Stipulated Protective Order. Having negotiated the terms of this Stipulated Protective Order and having agreed to be bound by it, ProMOS now presents no basis for undoing this negotiated-for protection of the RTL code that ProMOS is demanding Freescale produce.

With respect to (iv), damages-related documents, as Freescale informed ProMOS before it filed its motion, Freescale either has already produced, or will shortly produce, these documents. Again, any delay was caused by ProMOS's refusal to narrow its discovery requests. Once ProMOS finally identified the products it was actually accusing of infringement (as opposed to virtually every product made by Freescale), Freescale began collecting damages-related documents. Of course, ProMOS already would have received all these documents had it not refused to identify accused products for months.

As to (v), notwithstanding ProMOS's statements to the contrary (D.I. 29 at 2), Freescale has offered ProMOS the opportunity to depose a 30(b)(6) witness on multiple occasions. ProMOS insisted that its deposition should take place in Delaware, even though everyone attending the deposition (the witness and both sets of counsel) would have to travel there. ProMOS rejected Freescale's offer to schedule depositions in the most reasonable location in the U.S. given the circumstances, which in this particular instance was Austin, Texas, where the Freescale witness and facility are located. If ProMOS were truly interested in obtaining the information as its motion suggests, it already would have conducted the deposition.

Thus, contrary to what its motion papers say, ProMOS has not "bent over backwards to avoid involving the Court" in discovery disputes. The opposite appears to be true. On July 6, as noted above, ProMOS filed a motion to compel the production of documents related to 95 accused products from 12 product families that it had identified to Freescale just a few hours earlier. ProMOS ultimately withdrew the motion.[1] Then, on August 8, using the Court's emergency email procedure, ProMOS asked the Court, in effect, to speed up Freescale's delivery of technical documents related to those products that ProMOS had identified only a month prior (the Court denied the request as not being of an emergency nature). ProMOS's approach seems to be to generate discovery disputes where none exist. As in its previous discovery motions, ProMOS's complaints in this motion are without merit, and should be denied.

I.      PROMOS'S REFUSAL TO DEFINE AND CONFINE ITS DISCOVERY TO CHAN PATENTS THWARTED THE DISCOVERY PROCESS.[2]

Beginning with its discovery requests in April 2007, ProMOS for months sought broad discovery on virtually Freescale's entire product line. In particular, ProMOS sought discovery related to "Freescale Products," which it defined to include, *inter alia*, "microcontrollers, microprocessors, processors, digital signal processors, controller cores, processor cores and all other components or goods you manufacture or market for sale or sell *in any way that use, incorporate, work with or rely on cache memory*." (ProMOS's motion to compel, D.I. 29 at 3). By this definition, ProMOS's discovery requests covered Freescale

---

[1]     As explained herein, ProMOS withdrew its motion realizing that it was premature and not supported. Contrary to ProMOS's accusations, Freescale has produced the documents as it agreed to do.

[2]     Note that Part I of Freescale's brief, like Part A.1 of Freescale's Opening Brief in Support of Freescale's Motion to Compel ProMOS to Provide Infringement Contention and Licensing Information, explains how ProMOS's refusal to provide a reasonable scope delayed the discovery process.

products of any kind using a cache memory in any way--even though Chan did not invent cache memories and the Chan patents claim only certain uses of a cache memory (because many such uses were known in the prior art). Most of Freescale's product line has or uses a cache memory of some sort, and were literally within the scope of ProMOS's vastly overbroad requests. ProMOS's discovery requests were therefore improper because ProMOS made no attempt to confine its expansive definition of "Freescale Products" to products that could reasonably be considered to potentially within the scope of the Chan patents.

      A.    The Chan Patents, Which ProMOS Is Asserting Broadly, Are Very Narrow.

As described in detail in Freescale's Motion to Compel ProMOS to Provide Infringement Contentions and Licensing Information, the two Chan patents, U.S. Patent Nos. 5,488,709 and 5,732,241, are very narrow. As the Chan patents themselves acknowledge (*see, e.g.*, Fig. 4 of each patent), cache memory had been used in semiconductor technology for years before the Chan invention. Because cache memories were so well-known in the prior art, the inventor had a difficult time convincing the PTO to grant the two Chan patents, and made statements and repeatedly amended the claims, both of which had the effect of limiting the claim scope.

With respect to the Chan '709 patent, which is directed to a particular cache memory apparatus, the claims were amended four times before the PTO would grant the patent. In order to overcome the prior art cited by the PTO, the inventor argued that the distinguishing feature of the claims was not just any cache memory, but instead "[1] a cache memory which includes a memory write register for buffering data received from a host port and selectively providing that data to a RAM, to a system port, or to both, and [2] a write back register for holding data received from the RAM and selectively providing that data to a system port." Both

- 5 -

these arguments, and the fact that the claims were amended four times, narrow the scope of the Chan '709 claims to require particular structure and functionality that goes far beyond merely any product that in any way uses or works with cache memory, as ProMOS suggests.

Similarly, the inventor had to amend the claims of the Chan '241 patent four times, each time incorporating additional structure and features to its computer system claims before the PTO granted the patent.  To gain allowance, the inventor argued that the claims covered a computer system including, among other things, "a dual port cache memory coupled between a host processor and a system memory" with "one [port] connected to a host data bus of the system memory" and "having registers coupling cache storage locations to a host port and to a system port, wherein a data path between the host data bus and the system data bus is operably decoupled by buffering and selective provision of data to and from the cache storage locations by the registers, so as to allow concurrent transfer of data to and from the dual port cache memory." Again, these arguments and the four claim amendments narrow the Chan '241 claims, which also explicitly require particular structure and functionality beyond merely any product that in any way uses or works with cache memory.

   B.    ProMOS Refused To Narrow The Scope Of Its Discovery
         Requests Until July 6, 2007.

Given the limited scope of ProMOS's patents and the vast scope of permissible uses of cache memory, ProMOS cannot rightfully accuse, or seek discovery regarding, any products that uses or relies upon a cache memory "in any way."  Further, ProMOS cannot legitimately assert its patents against any product which does not have the specific structure and functionality that was required for patent issuance.

Since serving its responses to ProMOS's discovery requests on May 17, 2007, Freescale repeatedly met and conferred with ProMOS in an effort to narrow the scope of

ProMOS's requests to products in some way actually related to the Chan patent claims, as Freescale was fully willing to produce relevant documents. Indeed, contrary to ProMOS's suggestion that Freescale refused to produce documents despite having been provided with detailed information about the accused products (D.I. 29 at 4), Freescale months ago produced documents for the roughly 50 products that ProMOS identified in its initial responses to Freescale's first set of interrogatories.

For months, Freescale requested that ProMOS either specifically identify the remaining Chan-accused products (which ProMOS could do from the extensive technical documentation on Freescale's website, just as ProMOS apparently had done for the 50 products it identified earlier) or provide criteria reasonably related to the Chan structure and functionality which Freescale could then use to identify products. Freescale even went so far as to provide ProMOS with suggested criteria that would confine its discovery requests to certain features in the Chan patents (*See* Ex. A, July 10, 2007 letter from Ferguson to Jensen.)

Notwithstanding Freescale's extensive efforts, it was not until July 6, just a scant few hours before filing its (improper) motion to compel, that ProMOS provided a complete list of accused products, identifying an additional 95 products. Since July 6, Freescale has collected, from around the world, critical technical documents for these products and produced them to ProMOS on a rolling basis.

C.    ProMOS's Attempt to Explain Away Its Overly Broad and Unduly Burdensome Discovery Requests Is Not Grounded In Fact.

In its motion, ProMOS asserts that its requests "seek basic technical documents necessary for ProMOS to present its infringement case at trial." (D.I. 29 at 3.) In addition, ProMOS asserts that based on its definition of "Freescale Product," "[i]t should have been fairly easy for Freescale to generate a list of specific products." (*Id*. at 5.) As discussed above, the net

that ProMOS cast went far beyond ProMOS's characterization of merely seeking basic technical documents to present its case at trial.  In fact, any list of Freescale products based on ProMOS's definition would include virtually all Freescale products and potentially require production of virtually every file and document that exists at Freescale.[3]

ProMOS's initial insistence on seeking discovery of all products of any kind that use cache memory in any way, in plain disregard of the actual, limited scope of the Chan patent claims, thwarted most discovery relating to those patents.  ProMOS's self-inflicted refusal to either identify the remaining Chan-accused products using the extensive technical documentation on Freescale's website, or provide criteria reasonably related to the Chan structure and functionality which Freescale could then use to identify products, made it impossible for Freescale to proceed with producing technical documents relating to products accused of infringing those patents and was the sole cause of any delay in ProMOS receiving the technical documents it sought.  Of course, had ProMOS truly wanted to get to the merits of its allegations earlier, as opposed to for its own strategic purposes be committed to generating seeming discovery disputes, it could have provided the July 6 list of accused Chan products months earlier as Freescale had requested.

---

[3]  For example, ProMOS document request no. 27 seeks "All documents relating to … the design, development, or manufacture of any Freescale Product," and document request no. 28 seeks "All documents relating to … the design, development, or manufacture of each cache memory used with, incorporated in or relied on by any Freescale Product."  (*See* Ex. A to ProMOS's Opening Brief at 13.)

II.    THE DOCUMENTS THAT PROMOS CLAIMS ARE "CRITICALLY ABSENT" FROM FREESCALE'S PRODUCTION HAVE ALREADY BEEN PRODUCED OR DO NOT EXIST.

A.    Freescale Had Produced Its RTL Code Prior To ProMOS Filing Its Motion.

ProMOS's brief states that "Freescale has failed to produce … RTL documentation," (D.I. 29 at 1, 12.)  But as ProMOS is aware, on August 21, 2007, days before ProMOS filed its present motion, Freescale produced its RTL code for inspection.  (Ex. B, Aug. 21, 2007 letter from Feeling to Cook.)  ProMOS's statements to the contrary in its motion are wrong.

B.    Freescale Is Not Obligated To Create Documents That Do Not Already Exist, And If ProMOS Wants To Create Schematics It May Do So Under The Terms Of The Protective Order.

In its motion ProMOS accuses Freescale of failing to produce circuit diagrams and schematics even though Freescale does not typically generate such documents.  It is black-letter law that Freescale is not obligated to create documents for the specific purpose of answering ProMOS's discovery requests.  *See* 7 Moore's Federal Practice ¶ 34.14 (2007) ("[A] document that does not exist is obviously not within the possession, custody, or control of a party").  To the extent that circuit diagrams and schematics exist, those documents have already been produced to ProMOS.

ProMOS's contention that Freescale should have somehow just generated circuit diagrams and schematics of its own volition is not realistic.  Circuit diagrams and schematics are pictorial representations of an electric circuit, and there are many electric circuits in Freescale's products.  As Exhibit L to ProMOS's motion provides, modern circuits are designed using a hierarchical methodology, meaning that there are multiple levels of schematics that may be

- 9 -

generated for a particular circuit.  At the lowest level, the schematic or circuit diagram would show the hardware (*e.g.*, logical gates or transistors) that make up the circuit.  At a higher level, there may be a block diagram of a portion of the circuit.  Thus, there are many parameters that must be specified before a circuit diagram or schematic for a particular circuit can be generated and ProMOS's suggestion that Freescale "should be able to do so without undue effort or burden" misses the mark.  (D.I. 29 at 13.)

As noted throughout this brief, ProMOS seems more interested in generating seeming fact disputes than in allowing the parties to examine the merits of ProMOS's allegations.  Therefore, even though it is not obligated, Freescale would expect that if it were to generate schematics, ProMOS would continue its practice of complaining about the documents, accusing Freescale of improper conduct, and demanding additional discovery.

To the extent that ProMOS would like to "run the appropriate software on the descriptions provided by the RTL documentation and generate the circuit diagrams" (ProMOS's Brief in Answer to Freescale's Motion to Compel, at 5), that capability was contemplated by Paragraph 4 of the Stipulated Protective Order.  Paragraph 4 provides a detailed framework for ProMOS to use whatever software it would like with the RTL code that Freescale produced. Under that framework, ProMOS need only provide whatever authorized software it needs to Freescale and Freescale will install the software on the non-networked laptop.  Because only ProMOS can know exactly what it wants, it thus seems far preferable to allow ProMOS to adhere to the Protective Order and generate whatever schematics or circuit diagrams it desires from the RTL code produced by Freescale.

ProMOS's alternative argument that it should be allowed to access the computer system that Freescale uses at its facility so that ProMOS can generate circuit diagrams and

schematics is not supported in caselaw and should be rejected.  ProMOS states that the approach it suggests has been sanctioned by district courts under similar circumstances, and cites a single case: *Cornell Research Found., Inc. v. Hewlett Packard Co.*, 223 F.R.D. 55, 74-75 (N.D.N.Y. 2003).  In the *Cornell* case, however, the documents at issue actually existed; in fact, they had previously been produced in hard copy format.  *Id*. at 73.  The *Cornell* court allowed the patentee's expert to view "the technical drawings and specifications which [the accused infringer] maintains in the ordinary course of business in electronic format."  *Id* at 75.  Here, as discussed above, the circuit diagrams and schematics do not exist in the usual course of business—a fundamentally different set of facts than in *Cornell*.  Thus, ProMOS's reliance on *Cornell* is misplaced.  Nevertheless, as discussed above, ProMOS has the ability to generate its own schematics pursuant to the terms of the parties' Stipulated Protective Order.

      C.     Contrary To ProMOS's Assertion, Freescale's Production Includes Documents That Exist That Show The Specific Design And Layout Of Its Products

      Freescale has already produced a significant number of documents that exist in the usual course of business that show the structure and operation of the relevant circuits of the accused products.  This production includes product manuals that describe at a high-level the operation of the product, proprietary Freescale circuit/subsystem workbooks/manuals that provide specifications for various circuits and describe how the RTL code works, and the RTL code itself, the production of which is discussed more fully below.  For certain products, Freescale has produced circuit diagrams and schematics where those documents exist.  Not including RTL code, Freescale has produced over 90,000 pages that show the structure and operation of the relevant circuits of the accused products.  Thus, ProMOS's assertion that "Freescale has failed to produce any circuit diagrams, schematics, RTL documentation, or other documents that show the specific design and layout of its products" is facially wrong.

D.     <u>Freescale Is Producing Damages-Related Documents.</u>

ProMOS's requests for damages-related documents suffer from the same flaw as its other requests—they improperly implicated nearly every product Freescale makes.  Thus, ProMOS's assertion that it notified Freescale on June 25, 2007 that Freescale had failed to produce a laundry list of damages-related documents and that "there simply is no reason why Freescale could not have produced these materials," misses the real issue.  Until ProMOS provided a scope to discovery tied to its allegations, it was not possible for Freescale reasonably to produce documents relevant to the Chan patents.

Once ProMOS specified the products it actually was accusing of infringement, Freescale began collecting damages-related documents.  As Freescale had informed ProMOS before it filed its present motion, some of those documents already have been produced and the balance will be produced shortly.  (Ex. D, Aug. 7, 2007 letter from Michalik to Jensen.)

III.    FREESCALE'S PRODUCTION OF ITS RTL CODE WAS PROPERLY DONE PURSUANT TO THE TERMS OF THE PARTIES' PROTECTIVE ORDER.

The Stipulated Protective Order that ProMOS and Freescale negotiated and by which both parties agreed to be bound, provides a framework for the production of computer code.  As ProMOS confirms in its motion, any code must be produced on a non-networked laptop located in the offices of the producing party's Outside Counsel.  Freescale's RTL code, which basically provides a recipe from which all of its products can be immediately manufactured, is among Freescale's most highly-sensitive information.  If the code fell into the hands of any of Freescale's competitors, they would be able to manufacture products identical to Freescale's.  (Ex. E, Declaration of Michael Snyder.)  Freescale would not have voluntarily entered into the Protective Order without the RTL protections found in Paragraph 4.  During the

negotiation process, ProMOS never once suggested that Freescale's RTL code (which ProMOS knew it would seek in discovery) would not be subject to Paragraph 4.

      A.     ProMOS Knew And Agreed That RTL Code Is Computer Code Protected By Paragraph 4 Of The Protective Order.

Particularly disturbing about ProMOS's comments on this point is that ProMOS knew that Freescale considered RTL code to be covered by Paragraph 4 and then subsequently agreed to this provision. Specifically, in response to a direct question from counsel for ProMOS during the parties' negotiations of the Protective Order terms, counsel for Freescale advised that RTL code is to be protected by Paragraph 4 of the Protective Order. ProMOS subsequently *agreed* to those terms, and the parties then submitted the Stipulated Protective Order to the Court for entry. Moreover, during the negotiation process, ProMOS never once suggested that Freescale's RTL code (which ProMOS knew it would seek in discovery) would not be subject to Paragraph 4.

      B.     As The Parties Previously Acknowledged, RTL Code Is "Computer Code" Covered By Paragraph 4 Of The Protective Order.

Not happy with the deal it struck, ProMOS now attempts to miscast Freescale's "RTL code" as "RTL documentation" so as to avoid the protections provided Freescale by Paragraph 4 of the Protective Order. But ProMOS's McAlexander declaration does not affirmatively state that RTL code is not "computer code." (*See* Ex. E to ProMOS's motion at ¶ 6.) If that were the case, ProMOS would have submitted a declaration explicitly stating so. Instead, McAlexander draws a distinction between RTL, which he alleges merely describes the architecture of a circuit but does not instruct a computer to do anything, and "computer code," which he alleges does instruct the computer to perform some function. Based on this carefully-worded assertion, ProMOS asserts that:

- 13 -

> On its face, Paragraph 4 applies only to "computer code" and therefore has no applicability to RTL documentation, which merely contains information about the design of the circuit and unlike computer code, does not instruct the computer to perform any functions.

(*Id*. at 7.)

Paragraph 4 explicitly applies to "source, object, machine, or other such computer code." (Ex. F, Excerpt from Stipulated Protective Order.) ProMOS's argument here suffers from two fatal flaws. First, Paragraph 4 is not limited to code that can "instruct the computer to perform some function." Thus, other types of computer code are equally covered by this Paragraph. Second, under ProMOS's contention, source code and object code also would be excluded from Paragraph 4, despite their explicit identification in that Paragraph.

Source code is a generic term that describes a series of instructions drafted in some human-readable programming language. (*See* Ex. G, Webster's Dictionary Of Computer Terms at 481; Ex. H, Barron's Dictionary of Computer and Internet Terms at 350; Ex. I, The Computer Glossary at 477.) In order for a computer to use source code, the code must first be converted (*e.g.*, using a compiler) into a file that the computer can understand. (*Id*.) When source code is compiled, object code (which is also specifically identified in Paragraph 4) results. (*See* Ex. I.) Object code is then combined with other things and linked together in order to produce the machine code (also in Paragraph 4) that actually instructs the computer. (*See* Ex. H.) Thus, given that source and object code, like RTL code, do not actually "instruct the computer to perform some function," ProMOS's position that any code produced under Paragraph 4 must "instruct the computer to perform some function" excludes both the specifically-identified source code and object code and thus must be wrong.

RTL code is part of a class of programming languages called hardware description language ("HDL") that is used to design circuits that will eventually be fabricated on

a semiconductor chip.  (Ex. E, Snyder Declaration; Ex. J, The IEEE Standard Dictionary of Electrical and Electronics Terms at 895.)  Like source code, which is expressly covered by Paragraph 4 of the Stipulated Protective Order, RTL code also is a type of human-readable source code.  (Ex E.)  RTL code, like other types of source code, must be converted (*e.g.*, using a synthesis tool) into a form that a computer can understand.  (*Id.*)  Accordingly, RTL code is source code (and "other computer code") and is properly produced pursuant to the terms of Paragraph 4.

        C.      <u>ProMOS's Own Letters Use the Term "RTL Code."</u>

That RTL code is "code" and not merely "documentation" is confirmed in letters written by ProMOS's attorneys where the terms are used interchangeably.  In an August 3, 2007 letter, ProMOS uses the terms "RTL code" and "RTL documentation" interchangeably.  (Ex. K, Aug. 3, 2007 letter from Cook to Ferguson & Feeling.)  Similarly, in an August 30, 2007 letter, ProMOS again uses the terms interchangeably.  (Ex. L, Aug. 30, 2007 letter from Cook to Ferguson.)

        IV.     PROMOS'S 30(B)(6) TOPICS SUFFER THE SAME FLAW AS ITS DISCOVERY REQUESTS, AND DEPOSITIONS SHOULD BE CONDUCTED IN THE MOST REASONABLE LOCATION IN THE U.S.

ProMOS asserts that "Freescale has twice refused to appear for a Rule 30(b)(6) deposition in Delaware first noticed by ProMOS on July 3, 2007 for the purpose of exploring the types of technical documents maintained by Freescale for the accused products."  (D.I. 29 at 2.) ProMOS leaves out, however, that its Rule 30(b)(6) deposition notice had the same overly broad reach as its document requests, seeking testimony on virtually every Freescale product made since 2000.  In addition, ProMOS left out the fact that it sought testimony not only on the types

of documents, but also on technical aspects (*e.g.*, vague and undefined "features") of the Freescale products.

Freescale asked ProMOS to clarify and narrow its topics, both in terms of the products and the type of testimony so that Freescale could identify appropriate responsive witnesses. ProMOS, however, refused to substantively discuss Freescale's request until the July 20 meet-and-confer teleconference. At that time, ProMOS agreed to limit the scope to obtaining basic information about the types of technical documents maintained by Freescale. Freescale agreed to make witnesses available to testify regarding the narrowed scope as soon as possible given witness and counsel's schedules, and notified ProMOS on August 3 that it could make a witness available for a deposition on August 15 in Austin, Texas where the witness resides.

Because both parties are obligated to produce their witnesses in the United States, Freescale has repeatedly suggested that depositions be taken in whatever location in the U.S. that is most reasonable under the circumstances of a particular deposition. Based on Freescale's reasonableness approach, Freescale offered to produce this particular 30(b)(6) witness in Austin, Texas, which Freescale felt was reasonable because the witness lives there and because counsel for both parties already were scheduled to be in Dallas (a short flight away) for a settlement conference on August 17.

ProMOS, on the other hand, insists upon Freescale producing its witness in Delaware, even though that would require everyone attending the deposition—the witness and both sets of counsel—to travel to Delaware. ProMOS would only agree to travel to Austin if Freescale agrees to travel to Taiwan for all of ProMOS's depositions (an approach ProMOS calls "even-handed"), even though ProMOS elected to sue Freescale in the United States.

In any event, notwithstanding ProMOS's statements to the contrary, Freescale did offer ProMOS the opportunity to depose a 30(b)(6) witness on "the types of technical documents maintained by Freescale for the accused products." Because ProMOS was dissatisfied with the location, it declined to take the deposition. If ProMOS were truly interested in the information as its motion suggests, it already would have conducted the deposition. Instead, ProMOS chose to assert that Freescale was the party that was unwilling to proceed in an apparent attempt to create a discovery dispute.

Freescale stands ready to make a 30(b)(6) witness available to provide ProMOS information on the types of technical documents at Freescale at a location in the U.S. that is reasonable under the circumstances. Contrary to ProMOS's position, this location may not always be a location where everyone attending the deposition would need to travel. Indeed, Freescale has repeatedly told ProMOS that Freescale would consider taking depositions of ProMOS Taiwanese witnesses in Washington, D.C., where ProMOS' counsel reside, rather than make the witness (who already has to fly, so it's just a question of where he or she lands) and both sets of counsel always travel to Delaware. Moreover, last week Freescale offered to produce its 30(b)(6) Austin-based witness in Dallas at or near the time of the October 3 *Markman* hearing or the October 12 settlement conference in the Texas case since counsel for both parties already will be in the Dallas area. ProMOS has not responded to this offer.

V.      ANY DELAY IN OBTAINING DISCOVERY WAS SELF-
        INFLICTED AND PROMOS'S REQUEST FOR SANCTIONS
        SHOULD BE DENIED.

ProMOS's request for sanctions for what it alleges is "dilatory conduct" by Freescale should be denied, because any delay ProMOS experienced was self-inflicted. For months, Freescale informed ProMOS that its requests were overly broad, and suggested two ways to narrow the requests, yet ProMOS did nothing. On July 6, ProMOS finally provided a

complete list of accused products, and since then, Freescale has diligently collected and produced additional relevant documents. Any delay that ProMOS experienced in obtaining discovery was self-inflicted, and ProMOS's request for sanctions should be denied.

<u>CONCLUSION</u>

Freescale has produced all the technical documents it has for the circuits that are relevant to the Chan patents; Freescale is currently producing the damages-related discovery that ProMOS requested; Freescale's production of its RTL code pursuant to Paragraph 4 of the Protective Order was proper; and Freescale has offered a 30(b)(6) deponent. Thus, ProMOS's motion should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett*
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
302.658.9200

OF COUNSEL:

*Attorneys for Freescale Semiconductor, Inc.*

David L. Witcoff
Kevin P. Ferguson
John M. Michalik
JONES DAY
77 West Wacker
Chicago, IL 60601-1692
312.782.3939

F. Drexel Feeling
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
216.586.3939

Dated: September 10, 2007
1230662

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2007, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to the following:

> John G. Day, Esquire
> Steven J. Balick, Esquire
> ASHBY & GEDDES

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on September 10, 2007 upon the following individuals in the manner indicated:

**BY E-MAIL AND HAND DELIVERY**

John G. Day, Esquire
Steven J. Balick, Esquire
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
Wilmington, DE 19899

**jday@ashby-geddes.com**
**sbalick@ashby-geddes.com**

**BY E-MAIL AND FEDERAL EXPRESS
(FOR WEDNESDAY DELIVERY)**

Sten A. Jensen, Esquire
HOGAN & HARTSON LLP
555 Thirteenth Street, NW
Washington, DC 20004

**sajensen@hhlaw.com**

**BY E-MAIL**

Steven J. Routh, Esquire
HOGAN & HARTSON LLP
**sjrouth@hhlaw.com**

William H. Wright, Esquire
HOGAN & HARTSON LLP
**whwright@hhlaw.com**

William C. Gooding, Esquire
GOODING & CRITTENDEN, L.L.P.
**billgooding@gooding-crittenden.com**

_/S/ James W. Parrett, Jr._
James W. Parrett, Jr. (#4292)

EXHIBIT A

# JONES DAY

77 WEST WACKER • CHICAGO, ILLINOIS 60601-1692

TELEPHONE: (312) 782-3939 • FACSIMILE: (312) 782-8585

Direct Number:  (312) 269-4366
kpferguson@jonesday.com

JP239140
878247-615013

July 10, 2007

<u>VIA EMAIL</u>

Sten A. Jensen, Esq.
Hogan & Hartson LLP
555 Thirteenth Street, NW
Washington, DC  20004
sajensen@hhlaw.com

Re:     <u>*ProMOS Technologies v. Freescale Semiconductor, Inc.*</u>

Dear Sten:

I am writing with regard to ProMOS' Motion to Compel filed last Friday night and the issue of where discovery stands for both Freescale and ProMOS.  As Freescale advised ProMOS shortly before ProMOS filed its motion, ProMOS misstated Freescale's position with regard to ProMOS' Chan-related discovery requests.  That is precisely why we suggested conducting a proper meet-and-confer, but ProMOS unfortunately ignored this suggestion and filed its motion anyway.

Freescale's position is basic.  ProMOS is seeking document discovery that is exceptionally broad and burdensome, both in terms of the scope of products and the breadth of documents related to those products.  Freescale's position from the outset has been that there needs to be a narrowing in both scope and breadth of that discovery.  ProMOS has not seriously disputed that its requests are overbroad, and indeed its motion effectively acknowledges as much.

ProMOS' motion, however, continues to misstate Freescale's discovery position.  For example, Freescale has ***never*** "suggested," as ProMOS asserts, that ProMOS must provide infringement contentions before Freescale would produce technical documents related to Chan-accused products.  To the contrary, Freescale repeatedly said that it would work with ProMOS to provide any documents ProMOS reasonably requested pertaining to the Chan patents, and asked ProMOS to tell us precisely what documents it wanted.  In this regard, Freescale asked ProMOS to either: (1) narrow its definition of "Freescale Products" to some workable definition even arguably related to the Chan patents' claims, rather than seeking discovery on every product Freescale makes that contains, uses, works with or relies in any way on a cache memory (which Steve Routh acknowledged during our May 23 meet-and-confer call was much broader than the inventions claimed in the Chan patents), or (2) specifically identify products that ProMOS

CHI-1596888v3

July 10, 2007
Page 2

believes infringe the Chan patents.  Similarly, Freescale also asked ProMOS to specify the types of documents it really wanted relating to the Chan-accused products, rather than seeking virtually every document in Freescale's possession as literally requested in ProMOS' document requests (*see, e.g.*, document request nos. 6-10 and 16-20 [seeking every document containing the name of any employee or third-party who ever had any involvement whatsoever with any accused product] and document request no. 38 [seeking literally every document pertaining to each accused product]).  Although ProMOS stated in each of our discussions that they would consider and respond to Freescale's requests to narrow its discovery requests; however, it simply repeated its earlier demands and then filed its motion to compel instead.  Moreover, ProMOS' identification of more than 100 additional accused products shortly before filing its motion to compel obviously does not comply with its meet-and-confer obligations under the Local Rules. It is for these reasons (as well as those detailed below) that Freescale requests that ProMOS withdraw its motion until such time as the parties have properly conferred and determined whether any dispute does, in fact, exist that cannot be privately resolved between the parties.

We also were surprised to see in ProMOS' motion the unsupported assertion that it was "willing to allow Freescale to make a limited production of critical technical documents relating to its other cache memory products… ."  This is contrary to all of ProMOS' previous demands that Freescale produce "all documents" responsive to several dozen requests for production (*see, e.g.*, section (2) on page 3 of your May 18, 2007 letter and section A(2) on page 4 of your June 25, 2007 letter).  In fact, ProMOS' motion is the first effort by ProMOS to define a set of "critical technical documents" sufficient to allow it to investigate its infringement allegations. We view this as a positive step and is precisely what we requested almost two months ago.

As promised during our July 5 meet-and-confer, one day in advance of ProMOS' motion to compel, Freescale has already produced the requested critical technical documents for each of the four product families which ProMOS deemed "representative" and for which ProMOS generated infringement claim charts.  Additionally, and once again contrary to the representations in ProMOS' motion, Freescale has also produced critical technical documents for 5 other Freescale product families specifically accused in ProMOS' interrogatory responses, including the Coldfire V5 and V5E processor core, the e600 processor core, the i.MX31 processor, the Power Quicc II processor, and the Power Quicc III processor product families. Before making additional demands and accusations, please review the technical materials already produced for the previously-identified accused "representative" products, as ProMOS promised it would during our July 5 meet-and-confer, and let me know if ProMOS believes that additional information is needed to complete its infringement analysis.

From the overbreadth of newly accused products (*e.g.*, the MPC 5533 and 5534 processor products do not even "use, incorporate, work with or rely upon cache memory"), it appears that ProMOS has still not conducted any, let alone a good faith, review of the materials publicly available on Freescale's website to either: (1) narrow its definition of "Freescale Products" to something less than any product which contains, uses, works with or relies in any way on a cache

July 10, 2007
Page 3

memory or (2) even identify products that at least contain cache memories. Nevertheless, even through ProMOS apparently refuses to accept its burden of properly defining the discovery it seeks, in an effort to resolve this matter and move forward with the case, Freescale is willing to produce critical technical documents for all relevant products meeting the following criteria related to the claimed inventions:

Criteria for Chan '709 — (a) a first and second port; (b) a write register between the first port and the random access memory and between the first port and the second port; and (c) a write-back register between the random access memory and the second port.

Criteria for Chan '241 — (a) A dual port cache memory having a first port connected to a first data bus and a second port connected to a second data bus; and (b) A cache controller connected to the dual port cache memory, the cache controller having a first port connected to a first address bus and a second port connected to a second address bus such that the dual port cache memory and the cache controller are connected in parallel between a host processor and system memory.

Please let us know if these criteria are agreeable and Freescale will produce critical technical documents related to all qualifying products.

In a related matter, Freescale does not understand what ProMOS is seeking by way of the extremely broad topics in ProMOS' recent Rule 30(b)(6) notice. Freescale has repeatedly informed ProMOS that it generates three categories of documents regarding its products: (i) publicly available product manuals, (ii) proprietary Freescale circuit/subsystem workbooks/manuals, and (iii) RTL code. If this is what ProMOS is seeking through the noticed deposition, please explain why such a deposition is necessary because we do not understand why it is necessary to conduct a deposition about an attorney's representation. If ProMOS is seeking more than this confirmation, then please specifically identify the additional information sought so Freescale can better assess the deposition request and the witnesses who would be appropriate.

Finally, ProMOS' motion complaining of a failure to produce documents is ironic given ProMOS' own failure to produce virtually any documents relevant to Freescale's document requests, including but not limited to:

- Documents concerning invention disclosures (and drafts of same), engineering/laboratory/inventor notebooks, drawings/sketches, prototypes, notes, schematics, experimental or test results, computer modeling, correspondence, project status reports, e-mails, or other documents memorializing any portion of the conception/development/reduction to practice process;

CHI-1596888v3

July 10, 2007
Page 4

     - Documents sufficient to identify each person that worked on the project or projects that led to the development of the inventions claimed in the Chan patents and documents sufficient to identify each person's contribution to the project;

     - Internal ProMOS, Mosel and Mosel Vitelic file histories and other correspondence regarding the filing and prosecution of the Chan patents;

     - Documents concerning communication between ProMOS and Mosel Vitelic regarding the Chan patents and the patent coverage or scope of patent claims;

     - Documents concerning valuation of the Chan patents, claim construction, prior art, patentability, novelty, validity, enforceability, infringement and/or the subject matter disclosed or claimed by the Chan patents that were generated by ProMOS in connection with its due dilligence investigation performed in its dealings with Mosel Vitelic and its acquisition of an interest in the Chan patents; and

     - Reverse engineering reports, test reports, or studies of Freescale products and other documents concerning the decision to file suit.

     We requested these documents three months ago and continue to prefer to avoid involving the Court, but we understandably cannot afford to wait much longer.  Please tell us when we will receive the documents identified above.

     Given the pending deadline for Freescale to respond to the motion to compel, please indicate if the proposed compromise is acceptable and otherwise respond to the requests of this letter by noon Thursday, July 12, 2007.

            Very truly yours,

            Kevin P. Ferguson

# EXHIBIT B

# JONES DAY

NORTH POINT • 901 LAKESIDE AVENUE • CLEVELAND, OHIO 44114-1190

TELEPHONE: (216) 586-3939 • FACSIMILE: (216) 579-0212

Direct Number: (216) 586-7199
f.dfeeling@jonesday.com

JP618219
878247-615013

August 21, 2007

VIA EMAIL

Susan Cook, Esq.
Hogan & Hartson LLP
555 Thirteenth Street, NW
Washington, DC 20004
smcook@hhlaw.com

Re:    *ProMOS Technologies v. Freescale Semiconductor, Inc.*

Dear Susan:

This is in reply to your letter of August 20. Please be advised that ProMOS should have all of the critical documents for the accused Freescale products. Also, please be advised that the RTL code for the accused products is available for inspection pursuant to Paragraph 4 of the Stipulated Protective Order at the Jones Day Cleveland office. Please let me know who will be coming to inspect the code and on what dates so that I may arrange for building clearance.

Freescale provided to ProMOS the documents that exist in the usual course of business that show the structure and operation of the relevant circuits of the accused products. Your suggestion, with which we disagree, that ProMOS should be allowed access to Freescale's computer systems to "generate [] circuit diagrams and schematics" (even if the ability to generate such documents existed) because Freescale "repeatedly refused to produce"[1] such generated documents is wrong and makes no sense. Preliminarily, a party is under no obligation to create documents in response to a discovery request. To the extent a circuit diagram or schematic for a particular product existed, it was produced. Moreover, RTL code is primarily used in the design of complex systems instead of circuit diagrams and schematics. This is the use that Freescale makes of RTL code. Thus, it is understandable why an abundance of circuit diagrams and schematics do not exist for the accused Freescale products. And it should also be understandable why Freescale is not in a position to generate unspecified "schematics" that ProMOS might want, given that Freescale has no reason to generate schematics from RTL code (assuming it could be done) for cache memory in the ordinary course of its business, as it is not in the

---

[1] In the future, we'd prefer that you not be so quick to falsely accuse Freescale of "repeatedly refus[ing] to produce" that which you acknowledge must not exist. Your statement that one must "generate the circuit diagrams and schematics" acknowledges that the circuit diagrams and schematics do not exist and, consequently, must be generated.

CLI-1544284

JONES DAY

August 21, 2007
Page 2

business of designing cache memory.  Of course, ProMOS's expert may examine the RTL code for details on the accused Freescale products and generate schematics if that is possible.

Very truly yours,

F. Drexel Feeling

EXHIBIT D

# JONES DAY

77 WEST WACKER • CHICAGO, ILLINOIS 60601-1692
TELEPHONE: 312-782-3939 • FACSIMILE: 312-782-8585

Direct Number:  (312) 269-4215
jmichalik@jonesday.com

August 7, 2007

<u>VIA ELECTRONIC MAIL</u>

Sten A. Jensen, Esq.
Hogan & Hartson LLP
555 Thirteenth Street, NW
Washington, D.C. 20004

       Re:    <u>ProMOS Technologies, Inc. v. Freescale Semiconductor, Inc.</u>

Dear Sten:

This letter responds to your correspondence addressed to Kevin Ferguson dated July 30, 2007. As an initial matter, I note your letter inaccurately characterizes the history of the parties' discovery disputes in this litigation. A more accurate summary of events would acknowledge that the parties did not ultimately resolve the scope of Freescale's production until July 20. That is, it was not until July 20 that ProMOS finally agreed to withdraw the premature motion to compel it filed on July 6 and stick to the list of accused products it had failed or refused to provide until the afternoon of July 6 – just hours before filing its motion. In any event, the July 20 agreement to abide by the accused list of products came two weeks after ProMOS filed its premature motion and more than two months after Freescale first suggested ProMOS provide a list of accused products such that the scope of discovery could be sufficiently defined.

Furthermore, ProMOS's habit of rehashing and rewriting the history of previously-resolved discovery disputes, whether during phone calls or in correspondence, does nothing to resolve any current discovery issues ProMOS may have. ProMOS's insistence on continuing discourse concerning issues that have been resolved serves no legitimate purpose. Despite ProMOS's efforts to create a record – however inaccurate – of Freescale's alleged discovery deficiencies, the fact remains that only on July 20 did ProMOS finally agree to a workable scope of discovery. Prior to that time, Freescale neither was obligated to nor could have begun collecting information for ProMOS because ProMOS's requests sought virtually every document in the company.

Addressing the substance of your letter, Freescale reiterates its objection to ProMOS's discovery requests that seek information related to every product Freescale makes or has made, every person ever working in any capacity with such products, and every document associated with such products because the requests are overly broad and unduly burdensome.

CHI-1600504v1

**JONES DAY**

Sten A. Jensen, Esq.
August 7, 2007
Page 2

Concerning your questions regarding Freescale's document retention policy and licensing practices (Request Nos. 2-3 and 65-67, respectively), I refer you to Kevin Ferguson's letter of yesterday, which addresses these questions.

Concerning Request Nos. 6-15, rather than promising to look into these issues, Freescale reiterated in discovery conferences that ProMOS's requests are overly broad. In response, ProMOS stated it would consider whether its requests could be narrowed. To date, ProMOS has not made Freescale aware of any such efforts.

Concerning Request Nos. 16-20, 43, 68, Freescale is in the process of gathering responsive information and will produce it.

Concerning Request Nos. 22-31, 33-42, 44-49, 52-64, 69-70, 112, without bothering to match ProMOS's rhetoric or self-proclaimed irony, I believe I have addressed this issue above, including Freescale's disagreement with ProMOS's characterization of past discovery conferences.

Concerning Request Nos. 50-51, Freescale is in the process of gathering responsive information with respect to its TiN by PVD processes and will produce it. With respect to its TiN by CVD processes, Freescale maintains ProMOS has the information it requires to conduct its infringement analysis, or lack thereof. ProMOS's recently served discovery responses acknowledge that ProMOS presently has no contentions regarding infringement by CVD processes, so ProMOS has no good faith basis for continuing to pursue discovery related to Freescale's CVD processes. Should ProMOS supplement its responses to provide a basis for accusing Freescale's CVD processes, Freescale will reconsider its position.

Concerning Request Nos. 71-79, 85-87, Freescale recently supplemented its response to ProMOS's Interrogatory No. 2 to state it has not undertaken any efforts to design around any of the patents-in-suit. Freescale will produce information responsive to the other topics raised in your letter.

Concerning Request Nos. 88-109, 117, Freescale could not collect this information in the abstract prior to July 20, when ProMOS finally agreed to provide some definition regarding the scope of discovery. Freescale is now collecting responsive information and will produce it.

Concerning Request No. 112, ProMOS has not explained why it needs samples of the accused products, let alone 10 samples of each product. Freescale is willing to discuss this request further if ProMOS believes it can justify its request for samples.

Concerning Interrogatory No. 7, please see my response above related to Request Nos. 88-109, 117.

**JONES DAY**

Sten A. Jensen, Esq.
August 7, 2007
Page 3


Concerning Interrogatory Nos. 9-13, 15, again, Freescale could not provide this information in the abstract prior to receiving any identification of the accused products. Freescale is in the process of identifying the appropriate person(s) and products and will supplement its responses when it has done so.

Concerning ProMOS's Rule 30(b)(6) deposition notice, Drexel Feeling will be addressing this issue in a forthcoming letter.


Sincerely,

John M. Michalik

EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PROMOS TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-788 (JJF) |
| | ) | |
| FREESCALE SEMICONDUCTOR, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF MICHAEL SNYDER

I, Michael Snyder, declare as follows:

1.      I make this Declaration based on personal knowledge, I am over the age of 18, and I am competent to testify on the matters set forth herein.

2.      My educational and professional background is as follows:

a.      I hold a Bachelor of Science degree in Electrical Engineering and a Masters of Science degree in Electrical Engineering from the University of Michigan. I have worked as an integrated electronics and high performance processor designer for 15 years and have been awarded 15 U.S. Patents.

b.      I have been employed by Motorola, Inc. and Freescale Semiconductor, Inc. over the past 15 years and have contributed in various roles in the architecture, design, and development of microprocessors. I am currently a Distinguished Member of the Technical staff at Freescale Semiconductor.

3.      Register Transfer Language ("RTL") code is source code. RTL code is part of a class of programming languages called hardware description language ("HDL") and is used to design circuits that will eventually be fabricated on a semiconductor chip.

4.      When circuitry is designed and tested, RTL code is interpreted by a computer to simulate the behavior of the design. During this process, RTL code, like other source code, is compiled. The output of the RTL compiler process is then executed by the computer to simulate the design.

5.      After completing the design and testing phase, a computer interprets the RTL code and converts the functional requirements specified by the RTL code into a hardware implementation of the design. Hierarchical schematics are not needed and therefore typically are not generated during the design process.

6.      RTL code is particularly sensitive and should be protected to the greatest extent possible. Because RTL code completely defines the operational behavior of the design of Freescale's products, with Freescale's RTL code, a competitor would be able to make competitive products that are functionally exact clones of Freescale products with minimal research and development costs.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 10, 2007.

Michael Snyder

EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PROMOS TECHNOLOGIES, INC.,           )
                                     )
            Plaintiff,               )
                                     )
    v.                               )        C.A. No. 06-788 (JJF)
                                     )
FREESCALE SEMICONDUCTOR, INC.,       )
                                     )
            Defendant.               )
                                     )

## STIPULATED PROTECTIVE ORDER

To expedite the flow of discovery materials, to facilitate the prompt resolution of disputes

over confidentiality of discovery materials, to adequately protect information the parties are

entitled to keep confidential, to ensure that only materials the parties are entitled to keep

confidential are subject to such treatment, and to ensure that the parties are permitted reasonably

necessary uses of such materials in preparation for and in the conduct of trial, pursuant to Fed. R.

Civ. P. 26(c), it is hereby **ORDERED THAT:**

### CONFIDENTIAL INFORMATION SUBJECT TO THIS ORDER

1.    For purposes of this Order, "PROTECTED INFORMATION" is any information

designated, in proper accordance with this Order, as CONFIDENTIAL INFORMATION and/or

CONFIDENTIAL INFORMATION – OUTSIDE ATTORNEYS' EYES ONLY.    Any

PROTECTED INFORMATION obtained by any party from any person pursuant to discovery in

this litigation may be used only for purposes of preparation and litigation in this matter.

2.    "CONFIDENTIAL INFORMATION" shall mean all information or material, and

any copies thereof, that is produced for or disclosed to a receiving party, that a producing party,

including any party to this action and any non-party producing information or material

voluntarily or pursuant to a subpoena or a court order, considers to constitute or to contain trade secrets or other confidential research, development, technical, financial, or commercial information, whether embodied in physical objects, documents, or the factual knowledge of persons; and that has been so designated by the producing party. PROTECTED INFORMATION designated CONFIDENTIAL INFORMATION and information contained therein shall be available only to counsel for the parties, technical advisers who are assisting them, data processing vendors, graphics and trial consultants, court reporters, and court personnel, under the terms outlined for those groups of persons under Paragraphs 12-19 below. Moreover, any party witness or third-party witness may be shown at a deposition, or examined on, any document containing material designated "CONFIDENTIAL" if it appears from the face of the document that the witness authored or previously received a copy of it, or if specific documentary or testimonial evidence of that witness or others indicates that the document was communicated to or from the witness, or if the producing party so agrees.

3.      "CONFIDENTIAL INFORMATION" may be additionally designated "OUTSIDE ATTORNEYS' EYES ONLY." The OUTSIDE ATTORNEYS' EYES ONLY designation is reserved for CONFIDENTIAL INFORMATION that constitutes proprietary financial, sales, or technical data or commercially sensitive competitive information, such as patent licenses or documents relating to patent licenses, including CONFIDENTIAL INFORMATION obtained from a non-party pursuant to a current Nondisclosure Agreement ("NDA"), strategic plans, source code listing (and descriptions of their operation), object code listings (and descriptions of their operation), integrated circuit diagrams and settlement agreements or settlement communications, the disclosure of which is likely to cause harm to the competitive position of the producing party. PROTECTED INFORMATION designated

CONFIDENTIAL INFORMATION – OUTSIDE ATTORNEYS' EYES ONLY and information contained therein shall be available only to outside counsel of record for the parties ("Outside Counsel of Record"), technical advisers who are assisting them, data processing vendors, graphics and trial consultants, court reporters, and court personnel, under the terms outlined for these groups of persons under Paragraphs 12-19 below.  Moreover, any party witness or third-party witness may be shown at a deposition, or examined on, any document containing material designated "CONFIDENTIAL INFORMATION – OUTSIDE ATTORNEYS' EYES ONLY" if it appears from the face of the document that the witness authored or previously received a copy of it, or if specific documentary or testimonial evidence of that witness or others indicates that the document was communicated to or from the witness, or if the producing party so agrees.

4.      If a party is required to produce source, object, machine, or other such computer code ("Code"), it must do so in electronically searchable form and under the terms of this paragraph.   When such Code is exchanged, it will be handled in accordance with the "CONFIDENTIAL INFORMATION – OUTSIDE ATTORNEYS' EYES ONLY" designation, except that no electronic copies of the Code will be permitted.  The producing party shall produce Code by copying it in an electronically-searchable format to a stand-alone, non-networked (with all wireless functionality disabled or removed) laptop or desktop that contains appropriate software for reviewing the Code.  The laptop/desktop containing the Code will then be maintained by the producing party's Outside Counsel of Record, who will maintain the laptop/desktop at its offices.  If the requesting party wants to use specific software to view the Code, it must provide the producing party's Outside Counsel of Record with such software and certify that it has obtained all necessary licenses for such use.  If the requesting party is not willing to provide both the software and certification of license, then the producing party is not

- 3 -

obligated to provide any software identified by the requesting party. The producing party's Outside Counsel of Record will provide access to the Code upon written request of the requesting party, but in no case later than by the fifth business day following receipt of the written request, unless agreed by both parties. Access will be provided during normal business hours (9:00 a.m. to 5:00 p.m.), unless the parties set different hours. While the Code is maintained in the laptop/desktop, it will be handled in accordance with the "CONFIDENTIAL INFORMATION – OUTSIDE ATTORNEYS' EYES ONLY" designation, except that no electronic copies of the Code will be permitted. If the requesting party wishes to make a copy of certain limited portions of Code, such as routines or sub-routines, only one paper copy of those limited portions will be allowed on watermarked paper. The requesting party must maintain said paper copy under lock and key and must provide the producing party with advance notice of where the paper copy will be maintained. The requesting party will not be allowed to make or remove any wholesale copies of the Code from the laptop/desktop. No party shall disclose, carry, send, or transmit, or allow to be disclosed, carried, sent, or transmitted, in any manner, via electronic means or otherwise, any Code, including any summary, compilation, or copy of any portion thereof, outside the boundaries of the United States of America; provided, however, if a requesting party believes compelling circumstances have arisen requiring that party's Outside Counsel of Record to hand-carry out of the United States, or to access on a secure web site from outside of the United States, the producing party's Code, the requesting party will notify the producing party at least three (3) business days in advance and the producing party will consider reasonable protective measures that the Court can enforce to allow the requesting party's Outside Counsel of Record to so hand-carry or access the producing party's Code under the

- 4 -

circumstances presented.  If the parties cannot agree on such reasonable protective measures, the

requesting party shall seek relief from the Court.

     5.    The following information is not PROTECTED INFORMATION:

        a.    any information that at the time of disclosure to a receiving party is in the public domain;

        b.    any information that, after its disclosure to a receiving party, becomes part of the public domain as a result of publication not involving a violation of this Order;

        c.    any information that the receiving party can show by dated written records was already known to it prior to the disclosure;

        d.    any information that the receiving party can show by dated written records was received by it after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the producing party; and

        e.    any information which the receiving party can show by dated written records was independently developed by it after the time of disclosure by personnel who have not had access to the producing party's PROTECTED INFORMATION.

## DESIGNATION OF PROTECTED INFORMATION

     6.    Any document or tangible thing containing or including any PROTECTED INFORMATION may be designated as such by the producing party by marking it as CONFIDENTIAL INFORMATION and/or CONFIDENTIAL INFORMATION – OUTSIDE ATTORNEYS' EYES ONLY prior to or at the time copies are furnished to the receiving party.

EXHIBIT G



# WEBSTER'S NEW WORLD™

# DICTIONARY

*of*

# COMPUTER TERMS

## SIXTH EDITION

*The Best Computer Dictionary in Print*

Clear, complete, up-to-date

Extensive Internet coverage

More than 4,000 terms and acronyms

Bryan Pfaffenberger

**QUE®**

Webster's New World™
Dictionary of Computer Terms, 6th Edition

Copyright © 1997 by
Simon & Schuster, Inc.

All rights reserved
including the right of reproduction
in whole or in part in any form

Macmillan General Reference
A Simon & Schuster Macmillan Company
1633 Broadway
New York, NY 10019-6785

Macmillan Publishing books may be purchased for business or
sales promotional use. For information please write: Special
Markets Department, Macmillan Publishing USA,
1633 Broadway, New York, NY 10019.

A Webster's New World™ Book

MACMILLAN is a registered trademark of Macmillan, Inc.

WEBSTER'S NEW WORLD DICTIONARY is a registered trade-
mark of Simon & Schuster, Inc.

Library of Congress Catalog Card Number: 97-80220

ISBN: 0-02-861890-4

Manufactured in the United States of America

3  4  5  6  7        8  99  00  1  02



*(MPC)*-compatible *sound board* with recording capabilities, including a microphone. Sound Recorder serves as a control device, turning your computer into a digital tape recorder and saving recordings in .WAV files that other MPC-compatible programs can access.

**source**   The record, *file, document,* or disk from which information is taken or moved, as opposed to the *destination.*

**source code**   In a *high-level programming language,* the typed program instructions that *programmers* write before the program is *compiled* or *interpreted* into *machine language* instructions the computer can execute.

**source document**   In *dynamic data exchange (DDE)* and Object Linking and Embedding *(OLE),* the *document* that contains data linked to copies of that data in other documents, called *destination documents.*

**source file**   In many *MS-DOS* commands, the file from which data or program instructions are copied. See *destination file.*

**source worksheet**   In *Microsoft Excel,* a *worksheet* containing a *cell* or *range* linked to one or more *dependent worksheets.* The dependent worksheets reflect the changes that you make to the source worksheet.

**SPA**   See *Association for Systems Management (ASM).*

**spaghetti code**   A poorly organized *program* that results from excessive use of GOTO statements, making the program almost impossible to read and debug. The cure is to use a well-structured programming language (such as *QuickBASIC, C,* or *Pascal*) that offers a full set of control structures. See *structured programming.*

**spam**   Unsolicited advertising in a *Usenet* newsgroup or *e-mail.* The term is apparently derived from a Monty Python skit, in which patrons of a restaurant are unable to converse due to the constant repetition of "Spam, spam, eggs and spam, spam, spam, [etc.]" by a group of Vikings in the scene's background.

**SPARC**   Acronym for Scalable Processor Architecture. An open standard for a *RISC* microprocessor. Sun Microsystems manufactures a series of workstations based on the SPARC architecture called SPARCstations.

EXHIBIT H



# BARRON'S
## BUSINESS GUIDES

# Dictionary of Computer and Internet Terms

### Fifth Edition



- More than 1,800 key computer terms with definitions
  - Includes hundreds of words and expressions that apply specifically to the Internet
- User-friendly descriptions of programming concepts, desktop and other applications, and much more
  - Filled with illustrations

Douglas Downing, Ph.D., Michael Covington, Ph.D., and Melody Mauldin Covington

© Copyright 1996 by Barron's Educational Series, Inc.
Prior editions © copyright 1995, 1992, 1989, and 1986
by Barron's Educational Series, Inc.

All rights reserved.
No part of this book may be reproduced in any form, by photostat, microfilm,
xerography, or any other means, or incorporated into any information
retrieval system, electronic or mechanical, without the written permission
of the copyright owner.

All inquiries should be addressed to:
Barron's Educational Series, Inc.
250 Wireless Boulevard
Hauppauge, New York 11788

Library of Congress Catalog Card No. 96-9250

International Standard Book No. 0-8120-9811-0

**Library of Congress Cataloging-in-Publication Data**

Downing, Douglas.
    Dictionary of computer terms / Douglas A. Downing, Michael
  Covington, Melody Mauldin Covington—5th ed.
        p.      cm.
    Previous eds. published under title: Dictionary of computer terms.
    ISBN 0-8120-9811-0
    1. Computers—Dictionaries.    2. Internet (Computer network)—
Dictionaries.    I. Covington, Michael A., 1957–    .    II. Covington,
Melody Mauldin.    III. Downing, Douglas. Dictionary of computer
terms.    IV. Title.
    QA76.15.D667    1996
    004′.03—dc20                                        96-9250
                                                        CIP

PRINTED IN THE UNITED STATES OF AMERICA

987654321

cannot see it until after buying and opening the software package. In such cases, it can hardly be described as a valid contract. When dealing with unclear or unreasonable licenses, users should make a good-faith effort to obey copyright law and to avoid depriving the publisher of income. *See also* FREE SOFTWARE.

**SOLARIS** the version of UNIX sold by Sun Microsystems. *See* SUN WORKSTATIONS.

**SOLVER** a computer program that solves equations that may have variables on either side of the equal sign, such as $x = 1 + 1/x$. This contrasts with ordinary calculators, spreadsheets, and programming languages, which can only evaluate expressions that consist entirely of known values.

**SORT** to arrange items in numerical or alphabetical order.

There are many different algorithms that can be used to sort a group of items. If the number of items is small, it is probably best to use an algorithm that can be represented by a short program. If the number of data items is large, then it is more important to use a faster algorithm, even if it is complicated. Some algorithms assume that the data items have been read into the memory of the computer. However, if there is a very large number of items, it will be necessary to use an algorithm that works when the data are stored on an auxiliary storage device. Since sorting is such a common operation, many operating systems include built-in sorting algorithms. For examples of specific sorting algorithms, see BUBBLE SORT; INSERTION SORT; MERGE SORT; QUICKSORT; RADIX SORT; SELECTION SORT; SHELL SORT.

**SOUND BLASTER** a line of popular sound cards for PCs, marketed by Creative Labs, Inc., of Milpitas, California.

**SOUND BOARD** (or **SOUND CARD**) a circuit board that can be added to a computer to enable it to record and reproduce sound. Sound cards often include other features such as a MIDI musical instrument interface, a controller for a CD-ROM drive, and an audio amplifier that can drive speakers.

**SOURCE**

1. a place where information is copied from; the opposite of TARGET.

2. one of the three parts of a field-effect transistor (*see* FIELD-EFFECT TRANSISTOR).

**SOURCE CODE** a programming language designed for use by human beings, as opposed to OBJECT CODE, which is used internally in the computer. A compiler translates source code into object code.

**SOURCE PROGRAM** a program written in a programming language (such as C, Pascal, or FORTRAN) and fed into a computer. The compiler translates the program into a machine-language *object program*.

EXHIBIT I

# ALAN FRIEDMAN

# THE COMPUTER GLOSSARY

## The Complete Illustrated Desk Reference



## Sixth Edition

source statement

**sorter** (1) Sort program.

(2) Person who manually puts data into a specific sequence.

(3) Early tabulating machine that routed punched cards into separate stackers based on the content of a card column. The complete operation required passing the cards through the machine once for each column sorted.

**SOS** (1) (Silicon On Sapphire) MOS chip-fabrication method that places a thin layer of silicon over a sapphire substrate (base).

(2) (Sophisticated Operating System) Operating system used on the Apple III.

**sound bandwidth** Range of sound frequencies. The human ear can perceive approximately from 20 to 20,000Hz, but human voice is confined to within 3,000Hz.

**source** (1) Source of current in a MOS transistor. Same as *emitter* in a bipolar transistor.

(2) (The Source) Online information service in McLean, VA, launched in 1979 and purchased by CompuServe in 1989.

**source code** Program in its original form as written by the programmer. It is not executable by the computer directly. It must be converted into machine language by compilers, assemblers and interpreters.

In some cases, source code can be converted into another dialect or a different language by a conversion program.

**source computer** Computer in which a program is being assembled or compiled. Contrast with *object computer*.

**source data** Original data that is handwritten or printed on a source document or typed into the computer system from a keyboard or terminal.

**source data acquisition** Same as *source data capture*.

**source data capture** Capturing data electronically when a transaction occurs; for example, at the time of sale.

**source directory** Directory from which data is obtained.

**source disk** Disk from which data is obtained. Contrast with *target disk*.

**source document** Paper form onto which data is written. Order forms and employment applications are examples.

**source drive** Disk or tape drive from which data is obtained. Contrast with *target drive*.

**source language** Language used in a source program.

**source program** Program in its original form, as written by the programmer.

**source statement** Instructional phrase in a programming language (source language).

EXHIBIT J

IEEE Std 100-1996

# The IEEE Standard Dictionary of Electrical and Electronics Terms

## Sixth Edition

**Standards Coordinating Committee 10, Terms and Definitions**
**Jane Radatz, Chair**

This standard is one of a number of information technology dictionaries being developed by standards organizations accredited by the American National Standards Institute. This dictionary was developed under the sponsorship of voluntary standards organizations, using a consensus-based process.

ISBN 1-55937-833-6



90000

9 781559 378338

**register file** A set of registers which may be addressed by their number in the set. *Synonym:* register array.
(C) 610.10-1994

**register length (1) (electronic computation)** The number of characters that a register can store.    (Std100) 270-1966w
**(2)** The storage capacity of a register.    (C) 610.10-1994

**register marks or lines** Any mark or line printed or otherwise impressed on a web of material and which is used as a reference to maintain register. *See also:* photoelectric control.
(IA) [60]

**register, mechanical (pulse techniques)** An electromechanical indicating pulse counter. *See also:* pulse.
(NPS) 175-1960w

**register memory (A)** Use of high-speed general purpose registers as one would use memory, as in using registers to hold frequently-used data items. **(B)** Registers specifically included in the machine design for use as high-speed storage.
(C) 610.10-1994

**register ratio (watthour meter)** The number of revolutions of the first gear of the register, for one revolution of the first dial pointer. *Note:* This is commonly denoted by the symbol $R_r$.
(ELM) C12.1-1982s

**register reading** The numerical value indicated by the register. Neither the register constant nor the test dial (or dials), if any exist, is considered. *See also:* electricity meter.
(EEC/PE) [119]

**register set** A subset of the full array of registers in a machine which the processing unit is currently allowed to use. *Note:* Machines may have N registers of which the processor may be able to address only M at a time; this divides the register array into N/M register sets.    (C) 610.10-1994

**register transfer language (RTL)** A computer language used to represent the flow of information on a system level; for example, to show data at the level of computer devices such as registers, gates, and ALUs.    (C) 610.10-1994

**register-transfer level** A description of computer operations where data transfers from register to register, latch to latch and through logic gates are described. *Note:* This may be an abstract description or microcoding.    (C) 610.10-1994

**registration (1)** Accurate positioning relative to a reference.
(C) [20], [85]
**(2) (display device)** The condition in which corresponding elements of the primary-color images are in geometric coincidence. *See also:* registration.    (EEC/PE) [119]
**(3) (camera device)** The condition in which corresponding elements of the primary-color images are scanned in time sequence.    (EEC/PE) [119]
**(4)** Alignment of coordinate systems and phenomenological agreement between environment models.
(C/DIS) 1278.3-1996
**(5) (watthour meter)** *See also:* watthour meter—percentage registration.    (ELM) C12.1-1988
**(6) (watthour meter)** *See also:* image registration.
(C) 610.4-1990

**regressed (illuminating engineering)** A luminaire which is mounted above the ceiling with the opening of the luminaire above the ceiling line.    (EEC/IE) [126]

**regression test** Retesting to detect faults introduced by modification.    (C/SE) 1219-1992

**regression testing (software)** Selective retesting of a system or component to verify that modifications have not caused unintended effects and that the system or component still complies with its specified requirements.    (C) 610.12-1990

**regular binary** *See:* binary.

**regular expression** A pattern (sequence of characters or symbols) constructed according to the rules defined in 2.8.
(C/PA) 9945-2-1993

**regular file (1)** A file that is a randomly accessible sequence of bytes, with no further structure imposed by the system.
(C/PA) 1003.5b-1995, 9945-1-1996, 9945-2-1993

**(2)** A file that is a randomly accessible sequence of POSIX. - POSIX.Characters, with no further structure imposed by the system.    (C/PA) 1003.5-1992

**regular (specular) reflectance (illuminating engineering)** The ratio of the flux leaving a surface or medium by regular (specular) reflection to the incident flux.    (EEC/IE) [126]

**regular reflection (illuminating engineering)** That process by which incident flux is redirected at the specular angle. *See also:* specular angle.    (EEC/IE) [126]

**regular transmission (illuminating engineering)** That process by which incident flux passes through a surface or medium without scattering.    (EEC/IE) [126]

**regular transmittance (illuminating engineering)** The ratio of the regularly transmitted flux leaving a surface or medium to the incident flux.    (EEC/IE) [126]

**regulated circuit (A) (power and distribution transformers)** The circuit on the output side of the regulator, and in which it is desired to control the voltage, or the phase relation, or both. *Note:* The voltage may be held constant at any selected point on the regulated circuit. **(B)** The regulated circuit, in reference to a voltage regulator, is the circuit on the output side of the regulator, where it is desired to control the voltage, or the phase relation, or both. *Note:* The voltage may be held constant at any selected point on the regulated circuit.
(PE) C57.15-1986r

**regulated frequency** Frequency so adjusted that the average value does not differ from a predetermined value by an appreciable amount. *See also:* generating station.
(PE/T&D) [10]

**regulated power supply** A power supply that maintains a constant output voltage (or current) for changes in the line voltage, output load, ambient temperature, or time.
(AE) [41]

**regulated-power-supply efficiency** The ratio of the regulated output power to the input power. *See also:* regulated power supply.    209-1950w

**regulated voltage, band of (synchronous machines)** The band or zone, expressed in percent of the rated value of the regulated voltage, within which the excitation system will hold the regulated voltage of an electric machine during steady or gradually changing conditions over a specified range of load.
(PE) 421-1972s

**regulated voltage, nominal band of (synchronous machines)** The band of regulated voltage for a load range between any load requiring no-load field voltage and any load requiring rated-load field voltage with any compensating means used to produce a deliberate change in regulated voltage inoperative.    (PE) 421-1972s

**regulating autotransformer (rectifier)** A transformer used to vary the voltage applied to the alternating-current winding of rectifier transformer by means of de-energized autotransformer taps, and with load-tap-changing equipment to vary the voltage over a specified range on any of the autotransformer taps. *See also:* rectifier transformer.
(Std100) C57.18-1964w

**regulating circuit (thyristor)** A circuit that together with the power controller and the thyristor trigger equipment forms a system for automatic control of the desired variable.
(IA) 428-1981w

**regulating device (power system device function numbers)** A device that functions to regulate a quantity, or quantities, such as voltage, current, power, speed, frequency, temperature, and load at a certain value or between certain (generally close) limits for machines, tie lines, or other apparatus.
(PE/SUB) C37.2-1979s

**regulating limit setter (speed governing systems)** A device in the load-frequency-control system for limiting the regulating range on a station or unit. *See also:* speed-governing system.
(PE) 94-1970w

**regulating range (load-frequency control)** That range of power output within which a generating unit is permitted to respond to load frequency control.    (PE) 94-1991

EXHIBIT K

# HOGAN & HARTSON

Hogan & Hartson LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
+1.202.637.5600 **Tel**
+1.202.637.5910 **Fax**

**www.hhlaw.com**

August 3, 2007

**BY ELECTRONIC MAIL AND
OVERNIGHT MAIL**

Kevin P. Ferguson
Jones Day
77 West Wacker
Chicago Illinois 60601-1692
E-mail: kpferguson@jonesday.com

F. Drexel Feeling
Jones Day
North Point
901 Lakeside Avenue
Cleveland Ohio 44114
E-mail: fdfeeling@jonesday.com

RE:    **ProMOS Technologies, Inc. v. Freescale Semiconductor Inc. (D. Del. C.A. No. 06-
       7888)**

Dear Kevin and Drexel:

Earlier this afternoon you were served with a Second Notice of Deposition setting the Rule
30(b)(6) deposition for August 15, 2007 at the offices of Ashby & Geddes in Wilmington,
Delaware.  The topics set out in the Second Notice of Deposition are the same as those included
in the first Notice of Deposition served on Freescale on July 3, 2007, which set the deposition for
July 20, 2007.  Freescale failed to comply with that first Notice of Deposition, notwithstanding
the stated willingness of ProMOS to accommodate a request by Freescale to reschedule the
deposition at a time and place convenient to Freescale during the month of July 2007.  As a
result of Freescale's ongoing failure to comply with its discovery obligations, and in light of your
e-mail of this morning accusing us of misconduct while blithely asserting that you were still
"working on establishing a 30(b)(6) deposition date" (a full month after we served the first
notice), ProMOS will insist on strict compliance with the Second Notice of Deposition.  Please
provide us by August 9, 2007 with the names and titles of the individuals who will testify about
each of the subject matters listed in the Notice of Deposition.

We also continue to find unacceptable Freescale's conduct relating to the production of technical
documents.  As you know, the sole basis upon which ProMOS agreed to withdraw its motion to
compel on July 23, 2007 was your express representations during our July 20, 2007 conference
call that Freescale would produce the requested critical technical documents (including RTL

Kevin P. Ferguson
August 3, 2007
Page 2

code) by August 3, 2007, and if there were any documents that could not be produced by August 3rd they would be produced by August 10, 2007. This understanding about the timing of production was confirmed in Sten Jensen's letter of July 30, 2007 – a statement which Freescale has failed to refute, either in writing or during any discovery conference. Until your e-mail of last evening, you never gave any indication that Freescale intended not even to begin producing RTL documents until after all of the other critical documents had been produced. As was apparent from our discussion on our July 20 conference call, had you admitted to such an intention during that call, we would not have agreed to withdraw the motion to compel production of technical documents that was pending at that time.

We therefore were surprised and angered to hear from you late last night that the documents you promised to produce by today (which we have yet to receive) would not include any RTL documents and, moreover, would be limited solely to documents relating to Freescale's Coldfire processors – only one of the more than twenty families of products on which Drexel said we would receive documents, and the one product family as to which Freescale has argued that some or all of the processors should not even be accused products. We were even more upset to learn from your e-mail of last night that Freescale intends to withhold from its production all RTL documents for all of its products until after it has completed the remainder of its technical document production at some unspecified date. This position is particularly indefensible because we have repeatedly informed you that the RTL documentation is extremely important to our analysis of this case, while the user manuals and workbooks that you have been producing to date are plainly inadequate to that end. Indeed, our motion to compel pointed out that, "to the extent that Freescale does not maintain any circuit diagrams in hard copy or electronic form, ProMOS anticipates that it may become necessary for Freescale to provide ProMOS with access to Freescale's computer systems so that ProMOS's experts and counsel may review and copy the design information that is provided to and stored in the machines." Had we known that following our discussion on July 20, 2007 you would switch tracks and refuse to produce any RTL documentation until some unspecified time after August 10, 2007, we would have kept our motion to compel on the argument calendar for presentation to the Court today.

Accordingly, we insist that you commence producing RTL documentation for all identified products immediately, and that you complete production of all technical documents (including RTL code) for all such products by the close of business on August 10, 2007, as promised during the July 20, 2007 call. Your production must include RTL documentation in an electronic form that allows for its use to generate meaningful schematics. At the very least, we expect to receive for each product by August 10th the RTL documentation covering the following by that date:

     (i)      the cache memory;
     (ii)    the cache controller;
     (iii)   the Input/Output ("I/O");
     (iv)   the register holding data going into and from the cache block;
     (v)    the control circuits for the path of data from/to the main memory or I/O to/from the cache;
     (vi)   the control circuits for the path of data from/to the cache to/from the CPU; and

Kevin P. Ferguson
August 3, 2007
Page 3

(vii)   the control circuits for the path of data from/to the main memory to/from the CPU,

with the understanding that Freescale will agree to produce the RTL code for the entire chip should we decide it to be desirable or necessary in the future.

Finally, as set forth more fully in Sten Jensen's letter of July 30, 2007, Freescale has yet to produce in this lawsuit any documents responsive to Document Request Nos. 88-109 and 117, which seek basic information necessary for ProMOS to conduct its damages analysis, including but not limited to sales data, profit data, cost data, price lists, documents identifying and providing information about Freescale's distributors, retailers, and customers, and the other topics listed in Sten's letter. We must insist that these documents be produced immediately.

We look forward to your prompt response.

Sincerely yours,

Susan Cook

EXHIBIT L

# HOGAN & HARTSON

Hogan & Hartson LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
+1.202.637.5600 Tel
+1.202.637.5910 Fax

www.hhlaw.com

August 30, 2007

**BY ELECTRONIC MAIL**

Kevin P. Ferguson
Jones Day
77 West Wacker
Chicago, Illinois 60601-1692
E-mail: kpferguson@JonesDay.com

RE:    **Freescale Semiconductor, Inc. v. ProMOS Technologies, Inc.**, No. 4:06-cv-491
(E.D. Tex.)

Dear Kevin:

This is in response to your letter to Sten Jensen of August 24, 2007, which asks whether
ProMOS has RTL documentation for any of the Accused Instrumentalities, presumably in
response to ProMOS's efforts to obtain similar documentation in the Delaware action.

Contrary to the suggestion in your letter, P.R. 3-4 does not require the production of what you
refer to as "RTL code." Rather, that rule merely requires the defendant to produce "source code,
specifications, schematics, flow charts, artwork, formulas or other documentation sufficient to
show the operation of any aspects or elements of an Accused Instrumentality identified by the
patent claimant in its P.R. 3-1(c) chart." (emphasis added). Having produced detailed
schematics and circuit diagrams for the Accused Instrumentalities, some of which were several
hundreds of pages long, ProMOS has satisfied its obligations under P.R. 3-4. This is in contrast
to the Delaware action, where Freescale has not produced circuit diagrams or similar documents,
thus rendering the RTL documentation that much more important. In any event, ProMOS does
not have or maintain RTL code for any of the Accused Instrumentalities.

Please let us know if you wish to discuss this matter further.

Sincerely yours,

Susan Cook

cc: William H. Wright
Steven J. Routh
Sten A. Jensen
David L. Witcoff
Bill Gooding

\\\DC - 022856/000005 - 2597298 v1