IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PROMOS TECHNOLOGIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 06-788 (JJF) |
| ) | |
| FREESCALE SEMICONDUCTOR, INC., ) | |
| ) | |
| Defendant. ) | |

**SPECIAL MASTER'S REPORT AND RECOMMENDATION ON THE
MOTION OF PROMOS TECHNOLOGIES, INC. TO COMPEL
FREESCALE SEMICONDUCTOR, INC. REGARDING DOCUMENT REQUEST NOS.
123-125 AND INTERROGATORY NO. 32 (DM 5d)**

This matter comes before me as Special Master on the letter motion of Plaintiff, ProMOS Technologies, Inc. ("ProMOS"), to compel [D.I. 193] ("the DM5d motion") Defendant, Freescale Semiconductor, Inc. ("Freescale"), to produce documents responsive to Document Request Nos. 123, 124, and 125 ("DRN 123", "DRN 124", "DRN 125") and answer Interrogatory No. 32 ("ROG 32"). [D.I.133].

Based on the submittals of the parties underlying this motion and arguments made by both parties during the June 25, 2008 hearing on this motion, the Special Master recommends that ProMOS's motion to compel be DENIED.

### I. BACKGROUND

On March 10, 2008, ProMOS filed a Motion to Compel ("DM4") generally requesting production of "damages-related information as well as potentially technical documents." [D.I. 153]. DM4 addressed so-called "new" Freescale Products, that is any Freescale products not previously accused of infringement ("Exhibit 2 Products"). [D.I. 153 at 1] ("Freescale is continuing to withhold complete discovery on Freescale products except for those products that

ProMOS has specially listed by product number ..."). The Exhibit 2 Products were identified by ProMOS in its July 6, 2007 Motion to Compel. [D.I. 29].[1] Essentially, ProMOS believed Freescale had failed to identify new Freescale products that may also be infringing. [D.I. 153 at 3] ("Until last week, we did not understand that Freescale was continuing to withhold from discovery information on many Freescale products simply because they were not specifically listed on the July 7 list ...").

DM4, however, in the Special Master's view, fell far short of the requirements of D. Del. L.R. 7.1.3 in that it was not specific with respect to either the asserted targeted deficiencies or the relief ProMOS was seeking. Indeed ProMOS stated that it did not know the specific relief it needed because it did not know what Freescale was withholding. [*Id.* at 1] ("The precise relief required to remedy Freescale's discovery misconduct is not clear."). Because DM4 lacked specificity, the Special Master directed ProMOS to provide a listing of the specific deficiencies and the relief being requested. [3/13/08 Tr. at pp. 12:22-13:18] ("[S]o that I can better come to grips with what the first paper was looking for - - that that [sic] should suggest to Counsel for ProMOS that it was so broad that it could almost fall off the bus, if you will...I will require that ProMOS files a supplement to what has already been filed and specifically assert those discovery deficiencies."). ProMOS, in turn, submitted a list of document requests and interrogatories it believed required supplementation ("March 14 list"). [D.I. 154]. ProMOS again asserted that it could not know the precise number of discovery requests that needed to be supplemented. [*Id.* at 1] ("It is not possible for ProMOS to know at this point the extent to which various discovery requests require supplementation and/or the implication [] thereof"). In the Special Master's

---

[1] This Motion was withdrawn on July 23, 2007. [D.I. 36].

view, DM4 lacked the requisite definition necessary to focus on either the asserted discovery deficiencies and/or the commensurate relief. Calling DM4 a shot gun would not be off target.

In the Special Master's view, largely as a result of ProMOS's inability to better define the scope of DM4 coupled with Freescale's understandable inability to hit a moving target, the parties requested that the Special Master moderate meetings/negotiations between them in an effort to resolve DM4. The meetings conducted on April 4th and 9th of this year developed into more global discussions about discovery issues encompassing matters outside of DM4.

During the meetings the Special Master told ProMOS two things. First, the Freescale Exhibit 2 Products which ProMOS had already accused of infringement were not part of the DM4 motion and thus were outside the scope of the meetings - unless, of course, the parties agreed otherwise. [4/9/08 Tr. at pp. 85-6; 94; 130-32].

Second, any discovery issues raised after the meetings and any resolution of DM4 and the associated negotiations would require an explanation from ProMOS about why the issue was not raised earlier.

> JUDGE POPPITI: [Y]ou can expect, and I have said it in many different ways
> and maybe I should just put a finer point on this, if there is the need from
> ProMOS's point, for later discussion and then a later application, one of the
> questions I am going to have, even if Mr. Wamsley doesn't raise it, and I expect
> he would, is, if you are suggesting that, with respect to paragraph two products,
> information that you expect should have been given under 125 has not been given,
> my question is going to be: Why wasn't it raised earlier? If you hadn't been
> getting the information, then why wasn't it raised? I will ask that question. (4/9/08
> Tr. at p. 85)

After two full and exhausting days of negotiations, the parties' discussions were consummated in a written agreement ("the DM4 Agreement") (Ex. A) executed on April 24, 2006. The first sentence of Paragraph 2 of that agreement reads as follows:

> 2.   Freescale shall conduct a reasonable and good faith investigation
> and provide ProMOS with a list identifying all products (hereinafter the
> "Paragraph 2 Products") that, as of March 31, 208, either (1) have been

manufactured or sold by Freescale since December 2000 or (2) Freescale expects to manufacture or sell by June 30, 2008 that contain any of the "cores" listed in the attached Exhibit 1 (or that contain any other version of those listed cores), other than those products identified on ProMOS's list of accused products attached as Exhibit 2. DM4 Agreement ¶ 2.

The Paragraph 2 Products are also referenced later in the agreement with respect to documents related to damages (Paragraph 3) and document request no. 125 (Paragraph 7). DM4 Agreement ¶¶ 3 and 7. As is clear from the language of Paragraph 2 above, the DM4 Agreement specifically excluded the Exhibit 2 Products.

More than a month after the DM4 Agreement, ProMOS filed DM5d along with 3 other motions. [D.I. 192-195]. DM5d requests relief specific to the Exhibit 2 Products excluded from the DM4 Agreement. [D.I. 209 at 2] ("Freescale does appear to have produced a number of application notes for new products identified under DM4 the day before it filed its opposition, but those documents are not the subject of this letter brief").

Additionally, DM5d identifies Document Request Nos. 123-125 ("DRNs 123-125) and Interrogatory 32 ("ROG 32") as requiring supplementation or completion by Freescale. [D.I. 193 at 1] ("ProMOS has sought documents and information on those subjects in a number of document requests (Nos. 123-25) as well as in Rule 30(b)(6) deposition testimony and in Interrogatory No. 32"). DRNs 123-125 and ROG 32 generally relate to customer instructions and how Freescale customers use their products. ProMOS asserts in DM5d that Freescale has withheld such information and documents for the Exhibit 2 Products. [*Id.* at 1-5]. ProMOS also asserts that Freescale inappropriately limited its search for responsive documents based on a pre-existing agreement. [*Id.* at 2].

Freescale responds that the DM4 negotiations and the DM4 Agreement dispose of the issues raised in DM5d. [D.I. 205 at 1]. Freescale notes that DRNs 123-125 and ROG 32 were also identified in ProMOS's March 14 list in connection with DM4 and asserts that it is now too

late for ProMOS to raise these issues. [*Id.*] ("This time, ProMOS seeks to compel discovery under four of the same discovery requests under which it moved to compel DM4: document requests 123, 124 and 125 and interrogatory 32.") ("... ProMOS should not be heard at this late date to raise new demands for discovery under the same requests."). Finally Freescale represents that it did not limit its search for documents based on a pre-existing agreement and that it has produced, for example, customer applications notes for its products. [*Id.* at 3].

## II.  DISCUSSION AND CONCLUSIONS

In the Special Master's view, granting ProMOS relief regarding discovery on DRNs 123-125 and ROG 32 would be prejudicial to Freescale. More specifically, ProMOS's filing of DM5d well after the resolution of the DM4 motion would, if granted, prejudice Freescale by denying Freescale the benefits of compromises it made during the negotiations surrounding DM4 and burden Freescale with a discovery obligation beyond its ongoing obligation to supplement its discovery responses and production.

### A.  Exhibit 2 Products Were Not a Part of the DM4 Motion

While DM4 lacked specificity regarding discovery deficiencies as well as the relief requested, one thing is clear, DM4 clearly addressed only those Freescale products that it believed it did not know about, namely new Freescale Products. *Supra*. Indeed, ProMOS's focus in DM4 was on documents related to any new Freescale Products. Moreover, even after requesting relief regarding specific discovery requests, nothing in ProMOS's March 14, 2008 letter addressed Exhibit 2 Products. [D.I. 154]. Despite this fact, ProMOS attempted to interject the Exhibit 2 Products into the negotiations regarding DM4. [4/9/08 Tr. at pp. 45-48;115]. Even ProMOS's proposed draft of the DM4 Agreement (Ex. B) demonstrates that ProMOS, from the beginning of the DM4 negotiations, wanted all Freescale products, including the Exhibit 2

Products, to be within the purview of DM4. The final DM4 Agreement that ProMOS signed off on, though, does not track the language of ProMOS's proposal, but rather specifically carves out the Exhibit 2 Products.

Because ProMOS's DM4 motion dealt with only new Freescale Products, the Special Master indicated during the April 9th meeting that the Exhibit 2 Products were, absent an agreement by the parties, outside of DM4 and any discussions related thereto. [4/9/08 Tr. at pp. 85-86; 94; 130-32]. The language of the DM4 Agreement that consummated the discussions between the parties confirms that the Exhibit 2 Products were outside of the DM4 motion. DM4 Agreement ¶ 2 ("other than those products identified on ProMOS's list of accused products attached as Exhibit 2"). Further, ProMOS, in its reply letter, acknowledges that the Exhibit 2 Products were outside the scope of DM4. [D.I. 209 at 1] ("DM4 was focused exclusively on Freescale's obligations relating to so-called *new* products not previously identified by ProMOS in discovery. And it was for that reason that the DM4 discussions were limited to products that were not on ProMOS's July 2007 list. . . .").

### B. Timing of The DM5d Motion Prejudices Freescale

Because the Exhibit 2 Products were not part of DM4 or any subsequent agreement, in the Special Master's view, granting ProMOS's requested relief at this time would be both prejudicial and unduly burdensome to Freescale.

As moderator of the negotiations regarding DM4, the Special Master put ProMOS on notice that any discovery applications filed subsequent to the DM4 motion must include an explanation of why it was not filed earlier. [4/9/08 Tr. at p. 85] (JUDGE POPPITI: "If you hadn't been getting the information, then why wasn't it raised? I will ask that question."). The Special Master concludes that ProMOS has not provided sufficient explanation.

The only explanation offered is found in ProMOS's May 23, 2008 reply letter. [D.I. 209]. ProMOS suggests that because it did not receive the bulk of Freescale's documents until February and March of this year that "it cannot be faulted for not appreciating until Freescale's document production was complete that Freescale had not done what it said it would do in its discovery requests – produce documents responsive to Request No. 125 for all products listed in the July 2007 list." [*Id.* at 1].

ProMOS's explanation, however, rings hollow in light of ProMOS's statements during the DM4 negotiations and its proposed draft agreement going into the negotiations. More specifically, ProMOS believed at least as early as the April 4th meeting that Freescale's production was deficient with respect to the Exhibit 2 Products,[2] as evidenced by ProMOS's numerous attempts to wrap the Exhibit 2 Products into the DM4 negotiations and ultimate agreement. *See* examples above. The Special Master concludes that this position is contrary to ProMOS's claim that it did not appreciate Freescale's discovery deficiencies until the filing of DM5d well after the negotiated resolution of DM4. Accordingly, the Special Master concludes that ProMOS's explanation for its delay in filing DM5d is insufficient.

The Special Master made clear to ProMOS that the Exhibit 2 Products were absent agreement of the parties not part of negotiations regarding DM4 because DM4 failed to address the Exhibit 2 Products. *Supra.* Knowing that (1) the Exhibit 2 Products would not be part of the ultimate agreement resolving DM4; and (2) that a sufficient explanation would be required regarding any delay in filing subsequent motions, ProMOS could and should have raised its DM5d issues either prior to or concurrent with DM4. Had it done so, Exhibit 2 Products would

---

[2] Freescale answered ROG 32 on January 22, 2008. Until the filing of DM5, ProMOS had not challenged Freescale's answer as being incomplete.

have been part of negotiations in early April, thereby avoiding any prejudice to Freescale's ultimate negotiated resolution of DM4 issues.

Moreover, the Special Master is mindful that Freescale proceeded with negotiations regarding DM4 believing the Exhibit 2 Products were off the table. [4/9/08 Tr. at p. 84]. The Special Master is also mindful that in an apparent effort to facilitate an ultimate agreement between the parties, Freescale was willing to go beyond the relief requested in DM4. For example, Freescale agreed to produce product licensing related documents which in the Special Master's view were outside the scope of DM4. [4/4/08 Tr. at pp. 39:24-40:4; 4/9/08 Tr. at pp. 8-10]. Freescale's position is evidenced, for example, by its assertion that it would have no incentive to reach agreement on DM4 knowing DM5d would follow.

> JUDGE POPPITI: I understand what Mr. Wamsley is saying. If you are saying we are going to close down this table on DM4 and in a week and a half we are going to be right back on DM5 focuses on this same issue with different product, then there is not incentive to enter into an agreement. That's what I heard you day.
> MR. WAMSLEY: And that is what I said, yes. [4/9/08 Tr. at pp. 77-78].

In the Special Master's view, Freescale's understanding is reasonable, given the spirit in which the DM4 agreement was reached and the language of the agreement itself removing Exhibit 2 Products from its scope. To require Freescale to search again for documents regarding the Exhibit 2 Products responsive to DRNs 123-125 and to answer ROG 32 would divest Freescale of the benefits of its comprises made during the DM4 negotiations and be unduly burdensome at this stage of litigation.[3] (For an example of the burden that Freescale would encounter relating to gathering information on Exhibit 2 products, see 4/4/08 Tr. at pp. 80:19-

---

[3] While the Special Master is mindful that the Second Amended Omnibus Rule 16 Scheduling Order [D.I. 191] provided for a targeted date, namely May 13, 2008 by which the parties should file any dispute regarding supplemental discovery, the Special Master, for reasons stated herein, does not view DM5d to be related to supplemental discovery.

24). Such prejudice to Freescale could have been avoided by a timely filing of DM5d related issues.

WHEREFORE, for the foregoing reasons, the Special Master concludes that ProMOS's Motion to Compel Freescale to produce documents responsive to DRNs 123-125 and answer ROG 32 should be DENIED.

**The Special Master's Report and Recommendations will become a final order of the Court unless objections are taken within twenty (20) days as provided by the Court's Order of January 25, 2008. [D.I. 133]**

ENTERED THIS 10th DAY OF July, 2008

_____
Vincent J. Poppiti (Del. Bar. ID No. 100614)
Special Master